**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

---

| | |
|---|---|
| PAUL NIEVES, individually and behalf of all others similarly situated, | |
| *Plaintiff*, | Case No. 2:18-cv-02748-JTF-dkv |
| v. | FIRST AMENDED COMPLAINT |
| BAPTIST MEMORIAL HEALTH CARE CORPORATION, a Tennessee corporation, and BAPTIST MEMORIAL MEDICAL GROUP, INC., a Tennessee corporation, | CLASS ACTION |
| | JURY DEMAND |
| *Defendants*. | |

---

**FIRST AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

---

Plaintiff Paul Nieves ("Dr. Nieves" or "Lieutenant Colonel Nieves") brings this First Amended Class Action Complaint and Demand for Jury Trial against Defendants Baptist Memorial Health Care Corporation and Baptist Memorial Medical Group, Inc. (collectively, "Baptist"). Plaintiff, for his Complaint, alleges upon personal knowledge as to himself and his own acts and experiences and, as to all other matters, upon information and belief:

### INTRODUCTION

> *"I would suggest that you never self-report [violations of a federal emergency medical treatment law]. It's nuts. Because all you do, is you get two or three state agency people crawling around your facility for two or three days. And they never just look at the one thing, they look at everything. And I don't know about you, but every hospital I've been in has got something under some rock some place."*
>
> -Baptist Continuing Medical Education Course, EMTALA Compliance Update 2017

1.    Baptist is one of the largest "premier health care systems" in the United States,

1

with health care facilities, specialists, and providers located throughout the Mid-South. Seeking to attract and retain the best medical providers, Baptist claims to "reward their efforts with compensation and benefits packages that are highly competitive in the Mid-South health care community."[1]

2.      Unfortunately, it took flagrant discrimination against one of its top-performing obstetrician-gynecologists while he was serving in the United States Army Reserve—Plaintiff Lieutenant Colonel Nieves—to reveal that this simply wasn't true.

3.      In August 2017, Plaintiff Lieutenant Colonel Nieves began investigating Baptist for discriminating against him due to his service in the United States Army Reserve, including instances where Baptist withheld his pay, forced him to use paid time off during military leave, refused to continue paying for his company health insurance, and refused to renew his employment agreement just days before he left for a period of service in Kuwait.

4.      During the course of his investigation, Dr. Nieves discovered that Baptist had been engaging in an extensive scheme to cheat its employees and significantly underpay them.

5.      Specifically, Dr. Nieves learned that Baptist used its "production-based" compensation model to falsely "incentivize" providers—including him—to perform more procedures, by purportedly offering additional compensation to them based on the quantity and difficulty of procedures they performed. But Baptist designed the system in a way that kept providers in the dark as to how they would be credited for each procedure, so that it could systematically pay them less than they really deserved. Baptist was able to get away with this scheme for years because of the convoluted nature of the "production-based" compensation plan,

---

[1]      *Your Career with Baptist*, Baptist Memorial Health Care, https://www.baptistonline.org/careers (last visited October 22, 2018).

which it administered behind the scenes using a multi-step coding, billing, and payment process.

6.      At its core, Baptist was supposed to pay its "production-based" providers based on the number of "work relative value units" earned during each quarterly period. "Work relative value units" or "wRVUs" are a unit of measurement used by the U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services ("HHS-CMS") to measure the amount of work involved in a given procedure. To track a provider's wRVUs, Baptist required them to submit a five-digit medical billing code after a procedure, which corresponded to an assigned wRVU value. Based on the billing code, Baptist was then supposed to bill the individual, government, or insurance company for the procedure, and then compensate the provider for the procedure by counting a predetermined number of wRVUs towards the provider's quarterly goal.

7.      Unfortunately, Baptist routinely paid providers for less complex procedures, credited them with fewer wRVUs than deserved, or failed to credit them for procedures altogether, all to the detriment of potentially hundreds of Baptist providers and in violation of the law.

8.      Baptist has created a work environment that punishes those serving the United States as military personnel, and short changes employees who perform above and beyond minimum expectations. Through this systematic conduct, Baptist has profited at the expense of its employees and failed to support the vital needs of a veteran-employee. Not even litigation has been enough to change Baptist's ways, as demonstrated by its retaliation against Dr. Nieves following the initiation of this lawsuit.

9.      Accordingly, this Complaint seeks an order (i) declaring that Baptist's conduct is unlawful, (ii) requiring Baptist to cease the unlawful activities discussed in this Complaint, and (iii) awarding damages to Plaintiff and the proposed Class.

**PARTIES**

10.     Plaintiff Paul Nieves is a natural person and resident of the State of Tennessee.

11.     Defendant Baptist Memorial Health Care Corporation ("BMHCC") is a non-profit corporation existing under the laws of the State of Tennessee, with its principal place of business located at 350 North Humphreys Boulevard, Memphis, Tennessee 38120. BMHCC conducts business throughout the State of Tennessee, this District, and the United States.

12.     Defendant Baptist Memorial Medical Group, Inc. ("BMMG") is a non-profit corporation existing under the laws of the State of Tennessee, with its principal place of business located at 350 North Humphreys Boulevard, Memphis, Tennessee 38120. BMMG conducts business throughout the State of Tennessee, this District, and the United States.

**JURISDICTION AND VENUE**

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because (a) at least one member of the putative Class is a citizen of a state different from Defendants, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under the subsection apply to this action.

14.     This Court also has subject matter jurisdiction over Dr. Nieves's individual Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA") claims under 28 U.S.C. § 1331, as USERRA is a federal statute. This Court also has supplemental jurisdiction over Dr. Nieves's individual state common law claims under 28 U.S.C. § 1367(a), because the claims are so related to his federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

15.     This Court has personal jurisdiction over Defendants because they are headquartered in this District, conduct significant business in this District, and because much of the unlawful conduct alleged in this Complaint occurred in and emanated from this District.

16.     Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendants maintain their headquarters in this District, and the events giving rise to Plaintiff's Complaint occurred in this District. Venue is proper in this Division under Local Rule 3.3(b)(1) because Defendants reside in this Division.

## FACTUAL BACKGROUND

### I.      An Overview of Baptist.

17.     BMHCC is a health care system that operates a network of hospitals, medical centers, and specialty health care facilities throughout Tennessee, Mississippi, and Arkansas. Based in Memphis, Tennessee, BMHCC facilities serve thousands of patients each year across the Mid-South, and employ hundreds of doctors and other medical care providers. In 2017, BMHCC became the largest not-for-profit health care system in the region when it merged with Mississippi Baptist Health Systems.

18.     BMMG is a multi-specialty health care system with health care facilities located throughout the same region as BMHCC. BMMG a wholly-owned subsidiary of BMHCC, and like BMHCC, is based in Memphis, Tennessee.

19.     At all times relevant to this Complaint, BMMG's business and actions were controlled by BMHCC. BMMG's principal office, mailing address, and agent of service are the same as BMHCC's. BMHCC assists in managing and supervising BMMG and its hospitals' operations, and supervises BMMG's finances, budget decisions, and compensation-related activities—including those discussed herein—as well as its policies and procedures applied to employees like Dr. Nieves.[2]

---

[2]     Given this arrangement, it was Dr. Nieves's regular practice to contact both BMHCC and BMMG officers—including BMHCC Chief Operating Officer Paul DePriest and BMMG Executive Director of Operations Jeff Rogers—when trying to resolve issues regarding his

20.     BMHCC was also involved in much of the conduct described in this Complaint, either directly or through its agents, and at all times was aware—and approved—of BMMG's conduct related to Dr. Nieves's military service and the compensation of putative class members.

21.     One of the facilities in Baptist's network is the Women's Clinic, a healthcare clinic in Union City, Tennessee focusing on Woman's health issues. BMMG purchased the Clinic in 2013 from Dr. Robert Young, who worked at the Clinic until 2018.

22.     Initially, Baptist maintained the same organizational structure and systems that had previously been in place at the Woman's Clinic. However, in or around February 2014, Baptist—through BMMG, but at BHMCC's direction—required the Woman's Clinic to begin using software from the healthcare software company Epic Systems for, among other things, patient service and medical billing-related activities.

23.     In addition, while the Woman's Clinic had previously taken care of its own coding, billing, and collections, all billing and collections functions were thereafter centralized in Baptist's corporate offices.

24.     Throughout the period that the Epic Systems software was being implemented, and thereafter, BMMG Executive Director of Operations Jeff Rogers and BMHCC Executive Vice President and COO Paul DePriest were Dr. Nieves's primary points of contact regarding all issues with the Woman's Clinic's operations, his employment, his employment benefits, and Baptist's billing practices. He was also regularly in contact with both individuals regarding the rollout of the Epic Systems software, and it was understood by all parties that BMHCC exerted substantial (if not total) control over BMMG's practices in this area.

---

employment, his contract with BMMG, his military service, or his clinic's operations. He did so understanding that BMHCC controlled and supervised these BMMG functions, which was never contradicted by BMHCC, BMMG, or their agents through conduct, words, or otherwise.

## II.     Baptist Blatantly Discriminates Against Dr. Nieves Because of His Military Service.

25.     Dr. Paul Nieves is a licensed physician specializing in obstetrics gynecology and has practiced medicine in Tennessee since 2010 at the Woman's Clinic. In March 2011, Dr. Nieves was granted clinical privileges at Defendants' nearby hospital, Baptist Memorial Hospital – Union City. Dr. Nieves practiced medicine at the Woman's Clinic and Defendants' hospital until December 10, 2018, when Baptist barred him from working following the initiation of this lawsuit.

26.     In 2015, after two decades of caring for patients as a civilian doctor, Dr. Nieves decided to fulfill his longtime goal of serving his country in a way that allowed him to put his medical knowledge, training, and expertise to use at home and abroad, but without giving up his civilian medical practice.

27.     On May 29, 2015, Dr. Nieves completed the process of enlisting in the United States Army Reserve as a part of the branch's Medical Corps. He entered the Reserve as a member of the 75th Combat Support Group with the rank of Major. In mid-2018, Dr. Nieves was promoted to the rank of Lieutenant Colonel.

28.     Immediately following his May 2015 enlistment, Baptist took no known actions against Dr. Nieves due to his military status and/or obligations. [3]

---

[3]     Federal law recognizes the challenge those—like Lieutenant Colonel Nieves—face in trying to get their jobs back from wary employers after returning from military service. Beginning with the Selective Training and Service Act of 1940, Congress has repeatedly come down on the side of veterans in such disputes by passing laws to protect their jobs and job benefits, and to ensure that veterans will not face negative consequences for asserting their rights. "The restored veteran," Congress recognized, "could not be disadvantaged by his service to the nation." *Trailmobile Co. v. Whirls*, 331 U.S. 40, 58 (1947). Today, USERRA is the primary law protecting veterans' rights to employment and reemployment after a period of military service. *See* 20 C.F.R. §1002.2. Its goal is to "encourage non-career service in the uniformed services by eliminating or minimizing the disadvantages to civilian careers and employment which can result from such service." 38 U.S.C. § 4301(a)(1). USERRA

29.     All of that changed starting in the summer of 2016.

30.     Baptist's change of heart towards Dr. Nieves's military service was simple: Baptist felt *Dr.* Nieves was taking too much time off from his job to serve as *Lieutenant Colonel* Nieves, and Baptist felt cheated by these absences.

31.     Baptist's actions over the next two years followed a distinct pattern, reflecting a willful attempt to deny Dr. Nieves the benefits of his employment, and eventually, an intent to retaliate against him for trying to vindicate his rights. This pattern of willful misconduct by BMMG and BMHCC (both on its own and through its ownership and control of BMMG) took numerous forms, including, but not limited to:

A.    **Forced Use of Paid Time Off (PTO)**: Dr. Nieves was scheduled to complete a service obligation at Fort McCoy, Wisconsin from August 4 to August 29, 2016. He gave Baptist written notice of his duties sufficiently in advance of his absence. Prior to this time, Dr. Nieves had accrued substantial vacation time, sick leave, and PTO over the course of his employment. During the August 2016 period that he was on active duty, Baptist required that Dr. Nieves use PTO to compensate for his work absence. As a result, Dr. Nieves used approximately 200 hours of PTO to maintain his salary with Baptist while at Fort McCoy.

B.    **Failure to Pay for Extra On-Call Shifts**: Dr. Nieves's Employment Agreement included no specific requirements to perform on-call shifts (*i.e.*, being available for work for a 24-hour period). (*See* Employment Agreement, attached to the Complaint as Exhibit A.) On March 24, 2016, Dr. Nieves and BMMG executed a contract covering on-call shifts entitled "First Amendment to Agreement of Employment." (*See* Amendment to Employment Agreement, attached to the Complaint as Exhibit B.) The document added two sections to Dr. Nieves's existing Agreement, § 3.14 and Exhibit 6.1 § 1.1(h).[4]

---

accomplishes this by broadly prohibiting discrimination against veterans due to service obligations; requiring employers to treat veterans and non-veterans alike in determining pay, benefits, and other employment incidents; and prohibiting retaliation against those who invoke their rights. *See generally* 38 U.S.C. § 4301.

[4]     In the new Section 3.14, Dr. Nieves agreed to provide on-call coverage for ten (10) days per month, and "[a]ny day or days exceeding ten [] days will be considered additional days of on-call coverage." In the new Exhibit 6.1 §1.1(h), Baptist agrees that if Dr. Nieves "provides additional on-call coverage" in a month beyond the required ten days, he will be paid "EIGHT HUNDERED AND FIFTY AND 00/100 DOLLARS ($850.00) per 24-hour shift." (Ex. B, at 1.)

Beginning in April 2016 through January 2018, Dr. Nieves covered at least ten on-call shifts per month in each month he was not serving on active duty. In addition, during this period Dr. Nieves covered at least ninety-eight (98) additional on-call shifts. At a rate of $850.00 per additional shift, Dr. Nieves was entitled to be paid $83,330 for these shifts. Dr. Nieves was never paid for *any* of them, despite the explicit terms of his amended Agreement, and despite the fact that he—as required by his contract—properly logged and reported these excess shifts to the proper authorities within BMMG.

C.     **Denial of Health Benefits**: From 2014 through most of 2016, Dr. Nieves and his family were insured through the health insurance plan BMMG provides to its full-time physicians and their dependents. At the end of 2016, BMG's Jeff Rogers informed Dr. Nieves that he would no longer be allowed to remain on Baptist's health insurance during future periods of military service. This left Dr. Nieves with two options: (1) continue on a lapsing health plan and risk his wife or child being injured during a gap in coverage, or (2) purchase health insurance at his own expense. Under protest, Dr. Nieves chose the latter option.

Beginning in January 2017, Dr. Nieves began paying for health insurance from TRICARE, with premiums of $478.77 per month—several hundred dollars more than he had been charged by Baptist.[5] He has paid these premiums in each month since, at a total cumulative cost of approximately $10,000.

D.     **Withholding Payments**: Dr. Nieves was on active duty from August 7, 2017 through September 2, 2017, giving Baptist written notice of his absence sufficiently in advance. Shortly before leaving, BMMG Executive Director of Operations Jeff Rogers informed Nieves (through one of Rogers' subordinates at BMMG) that BMMG would not pay Dr. Nieves during his upcoming absence. Dr. Nieves protested this decision to Rogers, arguing that he was entitled to maintain his salary under USERRA. Despite additional communications with Baptist executives, Dr. Nieves did not receive any affirmative response.

On September 2, 2017, Dr. Nieves returned from his scheduled military service. He then checked his bank account to find that he had only been paid $3,681 during his absence—a deficit of $19,123, compared to what he was owed under his Employment Agreement. After Dr. Nieves continued raising the issue to Baptist, it relented by paying him the remaining $19,123 in October 2017. But the damage was done: in the preceding month, Dr. Nieves had been forced to

---

To receive compensation for these additional shifts, Dr. Nieves is required to submit a log of any additional shifts in one month to Baptist by the fifth day of the following month. (*Id.*)

[5]     TRICARE is a health insurance program for uniformed service members, retirees, and their families, and is managed by a joint, integrated Combat Support Agency called the Defense Health Agency.

spend down nearly $10,000 in savings and use credit cards to cover his and his family's expenses.

In a separate May 2018 incident, BMMG CEO Mark Swanson stated in a letter to Dr. Nieves that, while he was in Kuwait completing his military service, he had to choose one of two options for being paid: Nieves could (1) continue receiving regular salary payments, but accept that he would have to pay BMMG back at his quarterly "true-up" due to his decreased wRVU production while abroad, or (2) "temporarily cease or adjust the amount of your draw until you return from leave." *See* Section III.A, *infra* (explaining Dr. Nieves's production-based compensation plan). Under either scheme, Dr. Nieves would lose income he was rightfully entitled to, and potentially have his salary payments delayed—again.

E.    **Initiating an Unwarranted Investigation**: In June 2017, and then again in late July through August of 2017, Dr. Nieves was scheduled for a period of military service. Dr. Nieves gave Baptist written notice of his planned absences sufficiently in advance. On June 14, 2017 the Tennessee Department of Health wrote to Dr. Nieves, stating that an investigation had been opened into his practices as a doctor. The investigation centered on allegations that Dr. Nieves performed caesarian section ("C-section") births with no genuine medical need— as much as 71 percent of his deliveries in 2017 at that point.

In early July 2017, Dr. Nieves and a senior risk manager for BMMG met with a Department of Health investigator about these allegations. At the meeting, Dr. Nieves gave the investigator documentary evidence showing that his rate of C-sections in 2017 thus far had been less than 30 percent—below the national average. Additional documents showed that the *overall* rate of C-sections in 2017 at the Woman's Clinic and a nearby Baptist facility were closer to 71 percent, despite Dr. Nieves's otherwise low percentage. Nine days after the meeting, the Department of Health investigator wrote to Dr. Nieves stating that the investigation into him did not merit further action, and would be closed.

The misrepresented C-section information that sparked the Department of Health investigation could only have come from a person or entity with access to the Woman's Clinic's records—that is, Baptist or its agents.[6] Upon information and belief, Baptist shared this selective, deceptive information with the Department of Health knowing it to be misleading and with an intent to professionally harm Dr. Nieves due to his military-related absences.

---

[6]    After meeting with the Department of Health investigator, Dr. Nieves raised this point to the BMMG senior risk manager who attended the meeting with him. The senior risk manager agreed with his assessment, promising to look into it. But Dr. Nieves never heard anything more about the issue from the risk manager, BMMG, or otherwise.

F.    **Refusal to Renew His Contract**: On May 18, 2018, Nieves was scheduled for four months of military service in Kuwait. Dr. Nieves gave Baptist written notice of his service obligation sufficiently in advance. On May 8, 2018—just days before Dr. Nieves was set to leave for Kuwait—BMMG CEO Mark Swanson wrote to Dr. Nieves, stating that the company had decided not to renew his contract following its March 31, 2019 expiration. *After* he departed for Kuwait, BMMG left a letter on Dr. Nieves's desk at the Woman's Clinic stating that his clinical privileges were being suspended during his absence. Although the letter was dated May 11, 2018, Baptist intentionally waited until Dr. Nieves had left the country to deliver it to him, putting additional burdens on him during his time overseas.[7]

G.    **Refusal to Permit Document Inspection**: Dr. Nieves, through his attorneys, contacted Baptist to arrange for the review and copying of Dr. Nieves's personnel and billing-related records. Section V of Dr. Nieves's Employment Agreement allowed for this.[8] Baptist denied Dr. Nieves's request altogether, on the grounds that he had no basis to ask for them at all.

Baptist later relented, stating that Dr. Nieves himself could physically inspect the records on-site in Union City. Baptist was aware that Dr. Nieves was on active duty in Kuwait when this request was made, but demanded that Dr. Nieves alone physically inspect and copy the relevant records. An attorney speaking on Dr.

---

[7]    Baptist's motivation for taking this action was retaliatory, demonstrated in part by the fact that numerous employees of the Woman's Clinic and Baptist Memorial Hospital – Union City have been absent for similar periods—for instance, for maternity leave or for extended illness—and not had their clinical privileges suspended. BMMG's intent to do this in secret is further bolstered by the fact that clinical privilege determinations are made by Baptist Memorial Hospital – Union City's Credentials Committee, which made the determination about Dr. Nieves's privileges on May 8, 2018 and passed the recommendation on to the hospital's Medical Executive Committee ("MEC") for approval. Dr. Nieves has served on the MEC since at least 2013. However, the MEC voted to approve Dr. Nieves's suspension outside of his presence and without his prior knowledge of the vote.

[8]    Section V of the Employment Agreement provides the circumstances under which Dr. Nieves is allowed to view and copy relevant patient records, stating that he "shall be permitted reasonable access to the medical records of patients with whom Physician maintains a physician-patient relationship … including the right to make copies thereof, as reasonably necessary for the purpose of … a legal action, investigation, audit, review or similar proceeding … and [] the Parties shall act in a reasonable and cooperative manner." (Ex. A, at § V.) Section 3.2 of Exhibit 6.1 to the Agreement also provides that Dr. Nieves, to confirm that he had been properly compensated, "shall have the right to inspect a copy of the financial records used in or pertaining to the calculation of his or her compensation at any reasonable time." (Ex. A, at Exhibit 6.1 § 3.2.)

Nieves's behalf explained that Dr. Nieves could not reasonably do so, given his service overseas, and asked Baptist to make an accommodation to allow an attorney to inspect and copy the relevant records. Baptist refused.

Upon information and belief, Baptist's reason for refusing was to delay Dr. Nieves's access to records needed to investigate his claims and initiate the instant lawsuit. Upon information and belief, Baptist would have allowed a non-veteran employee's attorney to access such records under similar circumstances.

H.   **Improper Reclassification as an Independent Contractor and Removal of PTO**: Section 2.2 of Dr. Nieves's Employment Agreement states that "[t]he parties agree that Physician is an employee … and not an independent contractor." Exhibit 6.1, § 1 and 1.1(g) to Dr. Nieves's Employment Agreement provides that he will "receive those general benefits offered to physician employees of [Baptist] who are compensated on a production basis" and that "Physician shall receive credit for prior years of service with Woman's Clinic, PA." These benefits include insurance, plus non-insurance benefits such as PTO, vacation, and sick leave. (*See* Baptist Employee Handbook, attached as Exhibit C, at 21.)[9]

In the course of preparing his 2017 tax returns, Dr. Nieves discovered that Baptist had misclassified a portion of his income as independent contractor income. Dr. Nieves only worked at the Woman's Clinic under the control and supervision of BMMG and BMHCC, was a salaried and highly-skilled employee—an OB-GYN—whose tools of work were provided by Baptist, and had no freedom to work for other entities outside of Baptist. In addition, Dr. Nieves's Agreement describes him as an "employee," promises him insurance benefits as such, and states he will be "subject to customary employment tax withholdings and similar withholdings applicable to employees of Clinic." (Ex. A § 2.1; *id.* at Exhibit 6.1 §1.1; *see also* Ex. C, at 21.)

The misclassification caused Dr. Nieves direct financial harm, in the form of a $1,245 self-employment tax that he was forced to pay on his 2017 taxes. In addition, Baptist used its newfound view of Dr. Nieves's employment status to withdraw the substantial PTO, sick leave, and/or vacation time he had accrued to date, amounting to about 2,000 hours total, claiming that he was ineligible for them as a non-employee.

---

[9]   Dr. Nieves's Employee Handbook states that he is entitled to "accumulate and schedule PTO hours for things such as vacations, recognized holidays, as appropriate, and other personal matters." (Ex. C, at 21.) He is also allowed to carry forward PTO accrued in one year into the following work year, in an amount "equal to the maximum annual accrual level for their length of service." (*Id.*) Excess PTO beyond the allotted carryover amount is to be paid out at the end of the year as "50% of the [employee's] base wage." (*Id.*) Dr. Nieves also accrues, as an employee, sick pay benefits pursuant to Baptist's Sick Pay Benefit policy. (*Id.* at 25.)

**III.** **While Investigating Baptist's USERRA Violations, Dr. Nieves Discovered that Baptist Had Been Cheating its Employees and Significantly Underpaying Them.**

32.     While investigating Baptist's USERRA violations, Dr. Nieves discovered that Baptist had also been systematically underpaying its production-based compensation employees, including himself. The following is an overview of (i) Baptist's compensation model and (ii) how Baptist exploited its complex, obscured nature to significantly underpay its employees.

*A.* *Production-Based Compensation.*

33.     Baptist offers many of its providers—particularly physicians like and including Dr. Nieves—the opportunity to earn a base annual salary, and then receive additional compensation based on the amount and difficulty of procedures they perform. (*See generally* Ex. A, at Exhibit 6.1.) This is called "production-based compensation," and is administered by Baptist through a multi-step coding, billing, and payment process.

34.     To start, production-based compensation plans provide for an annual base salary, referred to an "Annual Draw." The Annual Draw—payable in equal biweekly installments—essentially requires that the employee perform a certain amount of work each quarter, as determined by the number of "work relative value units" they generate.

35.     "Work relative value units", or "wRVUs" (sometimes simply called "relative value units" or "RVUs"), are units used by HHS-CMS to measure the amount of work involved in a given procedure, including for purposes of physician compensation. In a hospital system such as Baptist's, every medical procedure has an assigned five-digit code and associated wRVU value. These wRVU values are primarily based on (1) the amount of work a given procedure requires, (2) the business costs of the procedure (rent, equipment, staff, etc.), and (3) liability insurance expenses. That figure is then typically adjusted based on the geographical location of the procedure (*i.e.*, Miami versus Union City) and multiplied by a conversion factor to turn the

wRVU into a dollar amount. A doctor performing a given procedure will receive a portion of the raw (or "global") wRVUs before the conversion factor is applied, generally based on the amount of work required of them for a given procedure.

36.     Upon information and belief, 1.0 wRVU is worth about $40 in compensation for production-compensated employees working for Baptist, like and including Dr. Nieves.

37.     For each quarter they work for Baptist, production-based employees—including Dr. Nieves—have to produce a target number of wRVUs through their work. If they exceed the target, they receive additional compensation, on top of their Annual Draw. If they fall short, they must return a portion amount of their salary to Baptist. This quarterly assessment is informally referred to as the "true-up."

38.     For example, during the three-month period beginning in October 2016 and ending in December 1, 2016, Dr. Nieves had a quarterly wRVU target of approximately 1,895.5 wRVUs. Had Dr. Nieves exceeded this target and generated 2,100 wRVUs during this period, he would have been entitled to approximately $8,180 in additional pay at his quarterly "true-up" (*i.e.*, $40.00 times 204.5 wRVUs). However, if he fell short and only generated 1,890.5 wRVUs, Dr. Nieves would have had to remit approximately $200 in pay to Baptist.

**B.      *Baptist Exploited the Complex Nature of Production-Based Compensation to Significantly and Systematically Underpay its Employees.***

39.     To track wRVUs, Baptist requires providers—or other staff at the facility—to submit five-digit medical billing code once a procedure is completed. These five-digit codes, in turn, correspond to a "global" wRVU value, of which the physician performing the procedure is entitled to a share.

40.     Based on the five-digit billing codes submitted, Baptist bills the patient, insurance company, or government for the specific procedure(s) performed. Baptist then purports to count the predetermined number of wRVUs towards the provider's quarterly goal. At the end of each

quarter, Baptist should then use these wRVUs to determine whether the provider had achieved their target goal—compensating them during the "true-up" if they exceeded their goal, or asking for a portion of the salary back if they fell short.

41.     Because this accounting occurs behinds the scenes in Baptist's corporate offices in Memphis, providers are often not able to track whether Baptist accurately compensates them. Baptist has taken full advantage of this fact.

42.     Since 2015, Baptist has routinely "downcoded" providers' wRVUs so that it could credit them with fewer wRVUs than actually earned, resulting in them earning less compensation for a procedure; not earning anything for a procedure; or even, depending on the total wRVUs they have earned by the quarterly "true up," having to remit money to Baptist.

43.     Although an individual, insurer, or government would pay Baptist for a procedure Dr. Nieves performed at the Woman's Clinic, Baptist would either compensate Dr. Nieves for a less complex procedure, credit him with fewer wRVUs than deserved, or fail to credit him altogether. This practice caused fewer wRVUs to be allocated to Dr. Nieves than he was due.

44.     For example, in September 2017 Dr. Nieves performed procedures at the Woman's Clinic that should have earned him 1,214 wRVUs. However, Dr. Nieves was only credited with 1,044 wRVUs for September 2017, depriving him of approximately $6,800 in income. Later, in February 2018, Dr. Nieves performed procedures that should have merited 1,375 wRVUs. Baptist only paid him for 1,091 wRVUs, depriving him over $11,000 in income.

45.     Unfortunately, this downcoding happened to Dr. Nieves nearly every month starting in April 2015, despite the fact that he was an exemplary doctor who consistently outperformed his production targets. Not surprisingly, because he consistently earned less than he anticipated and understood he would receive based on the procedures he performed and the language of his Employment Agreement, Dr. Nieves and his family were exposed to unintended

hardships, including difficulties paying the mortgage on their home and trouble covering the cost of college for his two children.

46.     Ultimately, through this misconduct, Baptist denied Dr. Nieves hundreds of thousands of dollars in income that he was rightfully entitled to.

47.     Baptist's conduct was not limited to Dr. Nieves, however. Baptist employs hundreds of health care providers who receive production-based compensation in facilities throughout Arkansas, Tennessee, and Mississippi, and controls their wRVU production-based compensation using wRVUs through the same procedures identified above. Upon information and belief, Baptist similarly failed to honestly and accurately calculate wRVUs produced by physicians (and other employees) across its network of hospitals and clinics.

48.     Physicians and other production-compensated employees in Baptist's network have complained to Baptist about inaccurate compensation—as Dr. Nieves did on multiple occasions—but have never gotten Baptist to admit it, much less fix the widespread issues with its compensation practices. On at least one occasion, when confronted about these problems, Baptist blamed the discrepancy on a glitch in the Epic Systems software it utilizes.

49.     Given the hundreds of providers employed by Baptist across three states, and the scope of Baptist's income-depriving conduct, Baptist has likely stolen millions of dollars of its providers' income that they were rightfully entitled to under their contracts.

IV.   **The Department of Labor Investigation.**

50.     In October 2017, Dr. Nieves began communicating with a U.S. Department of Labor, Office of Veterans' Employment and Training Service ("DOL") investigator. Dr. Nieves discussed most of the issues described herein to the investigator. (Some of the conduct, including the refusal to renew Dr. Nieves's contract, the written demand that he forgo part of his salary,

and the contents of Section V, *infra*, took place in February 2018 or later, and were not a part of the investigation.) Subsequently, DOL opened an investigation into BMMG.

51.     On February 23, 2018, the investigator wrote to Dr. Nieves and BMMG, stating that the DOL had found his claims to be meritorious after "thoroughly review[ing] [BMMG's] position as well as documentation provided by both parties." Specifically, the DOL found that BMMG violated USERRA by improperly withholding $19,123 in pay from Dr. Nieves for two months, and that "Nieves' military obligation[s] … w[ere] a contributing factor to the delay/denial of his timely payment as an employee." As a result of BMMG's actions, "Nieves was forced to deplete his savings and make excessive charges … to sustain his family and his financial status."

52.     In addition, the DOL found meritorious claims that Dr. Nieves had been unnecessarily forced to use PTO to maintain his salary while on active duty. As such, the DOL stated that he was entitled to recoup the 200 hours in PTO that he was forced to use in August 2016. Separately, the DOL agreed that Dr. Nieves was entitled to recoup the thousands of hours of PTO, sick leave, and other vacation time that BMMG had taken away from him.

53.     The DOL also found that Dr. Nieves was entitled to back-payment for unpaid on-call shifts; $1,245 in excess tax payments for his misclassification as an independent contractor; and recompense for his lost health benefits.

54.     DOL attempted to resolve this dispute with BMMG, but was unable to. On April 10, 2018, Investigator Abernathy wrote to Dr. Nieves, informing him that DOL could not get BMMG to agree to resolve this dispute. As such, Dr. Nieves decided to proceed on his own through private litigation pursuant to 38 U.S.C. § 4323(a)(3)(B) on October 26, 2018.

**V.      Baptist Retaliates Against Dr. Nieves for Enforcing His Rights.**

55.     Upon being sued by an employee with credible and well-documented claims of veteran discrimination and retaliation, many companies might try to avoid repeating the conduct originally giving rise to the lawsuit. Not Baptist.

56.     Instead, since filing this lawsuit Baptist has continued to harass Dr. Nieves, finding new ways yet to harm him in retaliation for trying to enforce his rights under USERRA (and Tennessee law).

57.     First, in November 2018 Baptist once again failed to pay Dr. Nieves for performing an excess on-call shift during the previous month (*i.e.*, October 2018). *See* ¶ 31(B), *supra*.

58.     Second, and far more seriously, Baptist cut off his patients' ability to schedule appointments with him. Starting in November 2018 Baptist failed to schedule patient visits for Dr. Nieves after December 31, 2018. This conduct served no purpose other than to retaliate against Dr. Nieves for enforcing his rights under the law. Administrative justifications were non-existent: Dr. Nieves was under contract with Baptist until April 1, 2019, and would have had ample time to see patients in January 2019 and thereafter. And medical ethics were *certainly* not the motive: maintaining the relationship between a patient and their OBGYN is critical, both during and after a pregnancy, and otherwise. There is simply no reason why an available OBGYN in Dr. Nieves's shoes wouldn't have been allowed to see patients with whom he had a preexisting relationship—unless the reason were retaliatory, as is the case here.

59.     Baptist purported to correct course on November 28, 2018 by allowing patients to be scheduled for Dr. Nieves on its internal scheduling system. But the damage had already been done, as Baptist has made it logistically near-impossible for Dr. Nieves to accrue wRVUs sufficient to hit his targets for the final three months of his contract. *See* Section III, *supra*.

Instead of simply allowing Dr. Nieves to finish out his contract, Baptist took affirmative steps to force him out early, gambling with patient safety in the process and depriving Dr. Nieves of his contractual rights to earn additional income.

60.    In late November and early December 2018, Dr. Nieves raised these issues to Baptist, both on his own and through counsel, demanding to know why Baptist continued to retaliate against him and make his job more difficult.

61.    On December 10, 2018, Baptist responded to Dr. Nieves's concerns by kicking him out of his office and forbidding him from practicing medicine in its Union City facilities. With four patients sitting in the Woman's Clinic waiting room, waiting to see their OBGYN for a scheduled appointment, two Baptist employees confronted Dr. Nieves and told him to pack his things and vacate the Woman's Clinic. After protesting that he should be allowed to see the patients then-physically present in the Clinic, the Baptist employees relented and allowed him to leave after those appointments were finished.

62.    Setting aside for the moment the potential adverse affects on his patients, like Baptist's prior refusal to schedule patients for Dr. Nieves, this conduct also deprived him of income. Dr. Nieves had about thirty patients left to see in the month of December, which would have added to his wRVU production totals and increased the size of his wRVU bonus. But because Baptist unceremoniously barred him from seeing patients for the last quarter of his contract, he will generate fewer wRVUs overall and earn a smaller bonus, as a result. Though Baptist did ultimately promise to continue to pay Dr. Nieves through the remainder of his employment agreement, the amount Baptist offered to pay is less than he otherwise would have earned had Baptist simply kept its promises, avoided discriminating against him, and refrained from retaliating against him.

19

63.     Through counsel, Baptist has claimed that Dr. Nieves remains an employee, even though he has been barred from practicing medicine at Baptist's facilities in Union City, had his name and image scrubbed from Baptist company websites, had his security passwords revoked, and had access to an online employee benefits portal suspended. Yet Baptist's conduct since October 2018 depicts a company desperate to force this "employee" out of his job by creating a wholly intolerable work environment.

64.     Baptist has also chosen to retaliate against Dr. Nieves in far pettier ways—but with serious effects on Dr. Nieves's life. First, Baptist has still failed to provide Dr. Nieves with documents needed to prepare his 2018 tax returns, even though he has typically received them within the first two weeks of each new year.

65.     Second, in light of Baptist's conduct Dr. Nieves had sought employment with another hospital system in Tennessee. His new employer contacted Baptist in December 2018 to request that Baptist verify Dr. Nieves's employment history—which Baptist knows is critical to Dr. Nieves obtaining clinical privileges at a new facility. But it took Baptist nearly six weeks to verify Dr. Nieves's work history, delaying him from starting a new job.

66.     In short, Baptist's conduct since Dr. Nieves filed this lawsuit has been justified by no reason other than a singular goal of retaliating against him for enforcing his rights under the law.

## CLASS ACTION ALLEGATIONS

67.     **Class Definitions**: Plaintiff brings this action on behalf of himself and a class of similarly situated individuals defined as follows:

> All current or former employees of (i) Baptist Memorial Health Care Corporation, Baptist Memorial Medical Group, Inc., or their subsidiaries, parents, successors, predecessors, and any entity in which they or their parents have a controlling interest, and (ii) who are or were compensated, in whole or in part, based on the amount of work relative value units earned.

Excluded from the Class are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which Defendants or their parents have a controlling interest and its current or former employees, officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's attorneys and Defendants' attorneys; and (6) the legal representatives, successors, and assigns of any such excluded persons.

68.     **Numerosity**: The exact number of members of the Class is unknown and not available to the Plaintiff at this time, but it is clear that individual joinder is impracticable. On information and belief, hundreds of individuals fall into the definition of the Class. Members of the Class can be identified through Defendants' records.

69.     **Commonality and Predominance**: There are many questions of law and fact common to the claims of the Plaintiff and the putative members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to, the following:

  a.     Whether Defendants fully and accurately compensated Plaintiff and the Class members for the total number of wRVUs they completed and earned;

  b.     Whether Defendants properly used and/or modified the Epic Systems software as part of their billing practices;

  c.     Whether Defendants improperly withheld from Plaintiff and the Class members any compensation earned; and

  d.     Whether Defendants breached their contracts with Plaintiff and the members of the Class.

70.     **Typicality**: Plaintiff's claims are typical of other members of the Class, in that Plaintiff and the putative members of the Class sustained damages arising out of Defendants'

uniform wrongful conduct.

71.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions. Plaintiff has no interests antagonistic to those of the Class, and Defendants has no defenses unique to Plaintiff.

72.     **Predominance and Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered and uniformity of decisions will be ensured.

**FIRST CAUSE OF ACTION**
**Breach of Contract**
**<u>(On Behalf of Plaintiff and the Class as Against Defendants)</u>**

73.     Plaintiff incorporates the foregoing allegations as if set forth herein.

74.     As medical providers at Baptist, Plaintiff and the Class were required to, and did, enter into contracts with Baptist as a prerequisite to employment.

75.     The contracts required Plaintiff and the Class to perform certain duties and functions at Baptist facilities and, in exchange, provided that Plaintiff and the Class would be compensated, in whole or in part, for wRVUs generated through their medical practice, when in excess of specified quarterly target goals.

76.     By signing and agreeing to Baptist's contracts and fulfilling their responsibilities and duties, Plaintiff and the Class fulfilled their contractual obligations to Baptist.

77.     As described above, Baptist, through its control over its facilities' billing practices, breached the Parties' agreements by failing to compensate Plaintiff and the Class for the full amount of wRVUs they earned, specifically by intentionally undercounting—or wholly discounting—the number of wRVUs they earned on procedures performed.

78.     Baptist's contractual breaches caused Plaintiff and the Class to suffer injuries and damages, including in the form of lost income and unpaid wages.

79.     As a result of its misconduct, Defendants are liable to Plaintiff and the Class for the full measure of damages allowed under applicable law, including compensation for the wRVUs Baptist improperly failed to compensate them for. Plaintiff, individually and on behalf of the Class, seeks actual damages for Baptist's contractual breaches, as well as interest, reasonable attorneys' fees, expenses and costs to the extent allowable.

## SECOND CAUSE OF ACTION
### Conversion
### (On Behalf of Plaintiff and the Class as Against Defendants)

80.     Plaintiff incorporates the foregoing allegations as if set forth herein.

81.     As detailed throughout this Complaint, Baptist willfully converted or misappropriated Plaintiff's and the Class's earnings by undercounting, discounting, and withholding wRVUs they rightfully earned. Baptist's conduct was for its own benefit, allowing it to avoid paying its production-compensation employees millions of dollars in income.

82.     Specifically, Baptist retained money it received from individuals, insurers, and governments, part of which should have been given to Plaintiff and Class members at their quarterly "true-up" for exceeding quarterly wRVU production goals. But because Baptist intentionally withheld wRVUs from Plaintiff and the Class, as described herein, it was able to retain money rightfully due to Plaintiff and the Class by reducing their wRVU production totals.

83.     As such, Baptist converted Plaintiff's and the Class's property and must return it immediately. Plaintiff and the Class are entitled to all remedies available to them at law.

### THIRD CAUSE OF ACTION
### Violation of USERRA, 38 U.S.C. § 4311(a)
### <u>(On Behalf of Plaintiff as Against Defendants)</u>

84.     Plaintiff incorporates the foregoing allegations as if set forth herein.

85.     USERRA provides that "[a] person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation." 38 U.S.C. § 4311(a).

86.     An employer may not deny a person any benefit of employment where the individual's protected status or service obligation is even "*one* of the reasons" for an adverse employment decision—to do so is prohibited discrimination. *Escher v. BWXT Y–12, LLC*, 527 F.3d 1020, 1026 (6th Cir. 2010) (emphasis added); 38 U.S.C. § 4311(c).

87.     Under the statute, a "benefit of employment" includes "the terms, conditions, or privileges of employment, including any advantage, profit, privilege, gain, status, account, or interest … that accrues by reason of an employment contract." 38 U.S.C. § 4303(2).

88.     Dr. Nieves's contract with BMMG provided that he would be paid out his annual salary on a biweekly basis. However, Dr. Nieves was told by Jeff Rogers at BMMG that Baptist would not make these biweekly payments during his 2017 military service obligations, amounting to nearly twenty thousand dollars. And BMMG did, in fact, withhold that pay, only compensating Dr. Nieves later during his quarterly "true-up."

89.     In fact, the DOL concluded, Dr. Nieves's "military obligation (July 15 to July 30, 2016; August 4 to August 29, 2016; and August 7 to September 2, 2017) was a contributing factor to the delay/denial of his timely payment as an employee of" BMMG.

90.     Under USERRA, a "benefit of employment" includes both wages and other benefits, such as PTO, vacation time, sick leave, and the like. *See* 38 U.S.C. § 4302(2). In addition, USERRA specifically provides protection for service members' PTO and vacation time, stating that "[n]o employer may require any such person to use vacation, annual, or similar leave during" periods of service. 38 U.S.C. § 4316(d); 20 C.F.R. § 1002.153(b).

91.     As described above, BMMG required Dr. Nieves to use 200 hours of PTO during the summer of 2016 while fulfilling a military service obligation. The DOL concluded that this was improper and violated USERRA.

92.     Similarly, BMMG misclassified Dr. Nieves as an independent contractor and confiscated his accrued PTO, sick time, and vacation time, as such, as part of a pattern of discrimination against him due to his veteran status and military service obligations. Doing so was improper and violated USERRA.

93.     Finally, BMMG failed to pay Dr. Nieves for working on-call shifts in excess of those required of him by his Amended Employment Agreement, costing him more than $80,000 in income as a result. This conduct was part of a pattern of discrimination against him due to his veteran status and military service obligations. Doing so was improper and violated USERRA.

94.     As such, BMMG willfully violated USERRA through all of the above-alleged conduct, and BMHCC is equally liable for this conduct as BMMG's parent corporation and for its own conduct. Dr. Nieves is entitled to all damages available at law, including liquidated damages and the monetary value of any benefits Baptist made him use. *See* 38 U.S.C. § 4343(d)(1)(B).

**FOURTH CAUSE OF ACTION**
**Violation of USERRA, 38 U.S.C. § 4317(a)(1)**
**(On Behalf of Plaintiff as Against Defendants)**

95.     Plaintiff incorporates the foregoing allegations as if set forth herein.

96.     USERRA protects service members' employer-sponsored health insurance. 38 U.S.C. § 4317(a)(1) requires employers who offer employee health insurance plans to provide service members the option to continue coverage during periods of military service.

97.     At the end of 2016, BMMG Executive Director of Operations Jeff Rogers informed Dr. Nieves that Baptist would no longer continue to provide him and his family with health insurance coverage during his periods of service. Rogers did not offer Dr. Nieves the option to continue health insurance coverage during such periods.

98.     As a result, Dr. Nieves left BMMG's health insurance plan and purchased insurance through TRICARE. This insurance has cost Dr. Nieves $478.77 per month, and Baptist has never offered to compensate Dr. Nieves for those expenses.

99.     Baptist willfully violated USERRA's requirement to offer Dr. Nieves and his family an option to continue on Baptist's insurance, and BMHCC is equally liable for this conduct as BMMG's parent corporation. Dr. Nieves is entitled to all remedies available at law.

**FIFTH CAUSE OF ACTION**
**Retaliation, 38 U.S.C. § 4311(b)**
**(On Behalf of Plaintiff as Against Defendants)**

100.     Plaintiff incorporates the foregoing allegations as if set forth herein.

101.     USERRA has a strict anti-retaliation provision, prohibiting private employers from "tak[ing] any adverse employment action" against a service member who "has taken an action to enforce a protection afforded" under USERRA, including participating in an investigation or exercising their USERRA rights. 38 U.S.C. § 4311(b); *see also* 20 C.F.R.

§1002.19. Retaliation occurs where a service member's enforcement or exercise of USERRA rights is a motivating factor for an employer's adverse action. 38 U.S.C. § 4311(c)(2).

102.     Baptist repeatedly and willfully retaliated against Dr. Nieves for asserting his rights under USERRA, including by refusing to renew his contract; suspending his clinical privileges; demanding that he forego a portion of his salary during his 2018 military leave; refusing reasonable access to documents he was entitled to have others review on his behalf; refusing to schedule patients for him after the initiation of this lawsuit; barring him from practicing medicine in its Union City facilities after the initiation of this lawsuit, and shortly after complaining about Baptist's refusal to schedule patients for him after December 31, 2018; failing to provide him with documents needed to complete his tax returns; and unduly delaying the verification of his work history to his new employer.

103.     Dr. Nieves specifically invoked his USERRA rights in an August 4, 2017 email to BMHCC COO Paul DePriest regarding BMMG's withholding of his biweekly salary payment. DePriest acknowledged the email and stated that he would "circle back" to Dr. Nieves, but never did. Over the following months, Dr. Nieves initiated and participated in a DOL investigation into BMMG regarding its discriminatory conduct towards him as a veteran.

104.     As described herein, that investigation concluded that BMMG violated Dr. Nieves's rights under USERRA in a host of ways, including by withholding his pay, improperly forcing him to apply vacation time to absences because of active duty, and limiting his and his family's access to health insurance.

105.     Just months after the conclusion of the DOL investigation in 2018, BMMG told Dr. Nieves that it was refusing to renew his employment contract, specifically citing his military service as a motivating factor for sending the notice.

106.     In the same letter refusing to renew his contract, BMMG demanded that Dr.
Nieves ignore his Employment Agreement and select one of two methods of payment—both of
which would result in his being underpaid—during his military service in Kuwait.

107.     In addition, BMMG suspended Dr. Nieves's clinical privileges without adequate
justification while he was on military leave in Kuwait, a step it has frequently not taken when
other employees have taken extended leave.

108.     Later, Baptist refused to grant Dr. Nieves (through his attorneys) access to
relevant documents on his behalf while he was on active duty in Kuwait. Dr. Nieves's contract
with BMMG provided him with the right to reasonably inspect and copy certain documents.
These inspection rights could have been exercised by Dr. Nieves's attorneys as agents acting on
his behalf. At minimum, allowing Dr. Nieves's attorneys to inspect the documents would have
been a wholly reasonable, cooperative, and lawful accommodation under the circumstances.
Upon information and belief, Baptist has allowed non-service members' attorneys access to
patient records under similar circumstances without issue.

109.     Even after this lawsuit was filed on October 26, 2018, Baptist apparently could
not help itself. Rather than correct course, it refused to schedule Dr. Nieves for patients after
December 31, 2018—despite the fact that he had three months remaining on his contract. And
when he complained about this conduct, Baptist kicked Dr. Nieves out of his office, scrubbed his
name and face from its websites, and did virtually everything else in its power to force Dr.
Nieves to quit.

110.     This conduct was primarily—if not solely—motivated by Dr. Nieves's various
efforts to enforce his rights under USERRA and other laws, as indicated by the timing, nature,
and circumstances of Baptist's conduct, among other things.

111.    As such, Baptist unlawfully and willfully retaliated against Dr. Nieves for acting

to enforce his rights under USERRA, and BMHCC is equally liable for this conduct as BMMG's

parent corporation. Dr. Nieves is entitled to all remedies available at law.

**SIXTH CAUSE OF ACTION**
**Breach of Contract**
**<u>(On Behalf of Plaintiff as Against Defendants)</u>**

112.    Plaintiff incorporates the foregoing allegations.

113.    Dr. Nieves and BMMG executed a document entitled "First Amendment to

Agreement of Employment" on March 24, 2016. The document added two new sections to Dr.

Nieves existing Employment Agreement: § 3.14 and Exhibit 6.1 § 1.1(h).

114.    In the new § 3.14, Dr. Nieves agreed to provide "on-call" coverage—that is, being

available for work for a 24-hour period—for ten (10) days per month. "Any day or days

exceeding ten [] days will be considered additional days of on-call coverage." In Exhibit 6.1

§1.1(h), BMMG agreed that if Dr. Nieves "provides additional on-call coverage" he will be paid

$850 per shift. To receive compensation for additional shifts, Dr. Nieves was required to submit

a log of the dates of his shifts in one month to BMMG by the fifth day of the following month.

115.    Between April 1, 2016 and January 31, 2018, Dr. Nieves worked at least ten (10)

on-call shifts in each month he was not on active duty. In addition, during this period Dr. Nieves

covered at least ninety-eight (98) on-call shifts beyond his required ten, and properly logged

these shifts with Baptist as required.

116.    Baptist never paid Dr. Nieves for *any* of these additional on-call shifts, despite its

contractual obligation to do so. At a rate of $850 per additional shift, this flagrant breach of

contract amounted to $83,330 in lost income for Dr. Nieves.

117.    Dr. Nieves's Employment Agreement also provided that he would be allotted sick

leave, vacation time, and/or PTO in accordance with BMMG's employee policies.

29

118.    In early 2017, BMMG discounted all of the sick leave, vacation time, and PTO that Dr. Nieves had accrued to date, with no justification, without any relation to any time off Dr. Nieves had taken or requested, and for no other reason other than to further pressure Dr. Nieves in relation to his military service.

119.    By backpedaling on its obligations to Dr. Nieves in this manner, BMMG breached its contract with Dr. Nieves, causing him injury in the form of lost PTO, vacation time, and sick leave.

120.    As a result, BMMG is liable to Dr. Nieves for breaching its contract with him in multiple ways, and he is entitled to damages and all other relief available to him at law for each breach. BMHCC is equally liable to Dr. Nieves as BMMG's parent corporation.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Dr. Paul Nieves, individually and on behalf of the Class, requests that the Court enter an Order:

A.    Certifying this case as a class action on behalf of the Class defined above, appointing Plaintiff as Class Representative, and appointing his counsel as Class Counsel;

B.    Declaring that Defendants' actions, as set out above, constitute breach of contract and conversion as to Plaintiff and the Class, and constitute breach of contract, violations of USERRA, and retaliation under USERRA, as to Plaintiff alone;

C.    Awarding all economic, monetary, actual, consequential, compensatory, liquidated, and punitive damages caused by Defendants' conduct, including additional damages for Defendants' willful conduct, as authorized by USERRA;

D.    Awarding injunctive and/or declaratory relief as is necessary to protect the interests of Plaintiff and the Class;

E.      Awarding Plaintiff and the Class their reasonable attorneys' fees and litigation expenses and costs;

F.      Awarding Plaintiff and the Class pre- and post-judgment interest, to the extent allowable; and

G.      Awarding such other and further relief as equity and justice may require.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**PAUL NIEVES**, individually and on behalf of all others similarly situated,

Dated: February 4, 2019              By: /s/ Daniel J. Schneider
                                          One of Plaintiff's Attorneys

Benjamin H. Richman
brichman@edelson.com
Daniel J. Schneider
dschneider@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378

Carl S. Back*
csback@comcast.net
ATTORNEY CARL S. BACK
601 Nassau Road
Marco Island, Florida 34145
Tel: 508.360.5089

*Application for admission to be sought.

Counsel for Plaintiff and the Putative Class

31